# In the United States Court of Federal Claims

No. 15-498C
(Originally filed: August 14, 2015)
(Re-filed: August 21, 2015)[*]

* * * * * * * * * * * * * * * * * * * *

ACC CONSTRUCTION CO., INC.,

        *Plaintiff*,

v.

THE UNITED STATES,

        *Defendant*.

Bid Protest; Two-Phase Procurement; Unstated Evaluation Criteria; 10 U.S.C. §§ 2305, 2305a; FAR 15.305; Lack of Prejudice.

* * * * * * * * * * * * * * * * * * * *

    *Karl Frederick Dix*, Atlanta, GA for plaintiff with whom was *Stephen J. Kelleher*, Washington, DC, of counsel.

    *Erica A. Hixon*, Civil Division, Department of Justice, Washington, DC, with whom were *Benjamin C. Mizer*, Principle Deputy Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, *Douglas K. Mickle*, Assistant Director, and *Tarrah M. Beavin*, of counsel with the U.S. Army Corps of Engineers, for defendant.

---

OPINION

---

BRUGGINK, *Judge*.

---

[*] This opinion was originally filed under seal. The parties were directed to confer and propose redactions. The court adopted the parties' suggested redactions, removed the information, and inserted brackets to replace the redacted content. The opinion is now prepared for release.

This is a pre-award, post-solicitation protest of the United States Army Corps of Engineers's (the "agency") decision to exclude plaintiff from participation in Phase II of the competitive bidding process for the design and construction of the Army Reserve Center Complex at the Aberdeen Proving Ground in Maryland ("Aberdeen Complex"). Currently before the court are the parties' cross-motions for judgment on the administrative record pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"). *See* RCFC 52.1(c). Plaintiff also filed a motion for leave to supplement the administrative record with two affidavits from its employees, several documents pertaining to the agency's initial and unsuccessful attempt to compete this procurement through small businesses, and a design specifications sheet. Defendant filed a motion to correct the administrative record, agreeing with plaintiff that the design specifications sheet should be included in the record. The motions are fully briefed, and we heard oral argument on August 5, 2015. For reasons set out below, we grant in part and deny in part plaintiff's motion to supplement the administrative record; we grant defendant's motion to correct the administrative record; we deny plaintiff's motion for judgment on the administrative record; and we grant defendant's cross-motion.

BACKGROUND[1]

On February 13, 2015, the agency's Louisville District issued Request for Proposal ("RFP") No. W912QR-15-R-0014 (the "solicitation"), requesting bids for the design and construction of an Army Reserve Center Complex at the Aberdeen Proving Ground in Maryland. Administrative Record ("AR") 145-501. The Aberdeen Complex will be comprised of a training building, a maintenance building ("OMS"), and an unheated storage building ("UHS"), and will have the capacity to house eleven Army Reserve units.

Prior to issuance of the current solicitation, the agency attempted to designate this project as a small business set-aside. The agency published a market survey requesting small businesses to submit descriptions of their past projects that were similar in scope to the proposed Aberdeen Complex. The survey specifically stated that projects considered to be similar in scope are those that involved "design and construction of multiple buildings that include:

---

[1] The facts are drawn from the administrative record.

army reserve complexes, armed forces training complexes, office complexes, education facilities, and multi-story multipurpose complexes." AR 5.

The agency received a number of responses to this survey. One response that the agency considered acceptable was from a small business joint venture, [       ], which submitted past performance examples, primarily consisting of pre-engineered metal buildings. AR 6-7, 54. Due to the interest generated, the agency issued the first solicitation for the Aberdeen Complex, RFP No. W912QR-14-R-0018, as a small business set-aside. After receiving proposals from small businesses, however, the agency determined that the set-aside was unworkable due to its inability to generate an acceptable bid price. Later, in preparing to advertise the project as unrestricted, the agency noted that the "current scope was not modified from the prior acquisition attempt." AR 59.

In the pre-solicitation notice for the second solicitation, the agency described several construction requirements for the Aberdeen buildings: "[P]ermanent construction with reinforced concrete foundations, concrete floor slabs, structural steel frames, masonry veneer walls, standing seam metal roof, Heating, Ventilation, and Air Conditioning (HVAC), plumbing, mechanical systems, security systems, and electrical systems." AR 69. This language is identical to that contained in the sources sought notice issued before the small business market survey.

For the unrestricted solicitation, the agency decided to utilize a two-phase procurement method to identify the contractor that would bring the most value to the agency. Under Phase I, offerors submitted a limited proposal comprised of past performance, technical, and pro forma information. The solicitation asked the offerors to list in the past performance section three projects that were similar in size and scope to the Aberdeen Complex. AR 153. The Aberdeen Complex is roughly 78,004 square feet in size. Projects similar in size are those that were "a minimum of 45,000 square feet." *Id*. The Aberdeen Complex will require the construction of a training building, a maintenance building, an unheated storage building, a vehicle wash platform, and other site improvements, such that the completed center is capable of supporting Army Reserve units and their training missions.

The solicitation defined a project "similar in scope" as one that involved "NEW CONSTRUCTION of multi-story building facilities such as training complexes, office complexes, educational facilities, and multi-purpose

3

complexes." *Id*. In the technical section, offerors were required to "[p]rovide a management plan for the project that describes how [their] labor, resources, designers, subcontractors and material suppliers will be coordinated and used to ensure successful completion of the project." AR 155. The management plan had to "demonstrate a clear understanding of the work and an ability to coordinate resources to ensure successful pursuit of the work." *Id*. Finally, offerors were requested to include several other documents regarding their bonding and financial capabilities within the pro forma section.

The agency received [ ] offers in response to the solicitation. A Source Selection Evaluation Board ("SSEB") was created to review and rate the offers so that up to five offerors could be selected to advance to Phase II. The SSEB applied several adjectival rating criteria in making its determinations. Under past performance, the SSEB evaluated the projects listed by the offeror for relevance and confidence. For relevance, the SSEB looked to the following table:

| Rating | Definition |
| --- | --- |
| Very Relevant | Present/past performance effort involved essentially the same scope and magnitude of effort and complexities this solicitation requires. |
| Relevant | Present/past performance effort involved similar scope and magnitude of effort and complexities this solicitation requires. |
| Somewhat Relevant | Present/past performance effort involved some of the scope and magnitude of effort and complexities this solicitation requires. |
| Not Relevant | Present/past performance effort involved little or none of the scope and magnitude of effort and complexities this solicitation requires. |

AR 151. Based on the relevance of each of the listed projects, the SSEB then assigned an overall confidence rating, reflecting whether the SSEB believed the offeror could complete the Aberdeen Complex project and characterizing

the offeror's overall past performance rating.  These ratings are encapsulated in the following table:

| Rating | Definition |
|---|---|
| Substantial Confidence | Based on the offeror's recent/relevant performance record, the Government has a high expectation that the offeror will successfully perform the required effort. |
| Satisfactory Confidence | Based on the offeror's recent/relevant performance record, the Government has a reasonable expectation that the offeror will successfully perform the required effort. |
| Limited Confidence | Based on the offeror's recent/relevant performance record, the Government has a low expectation that the offeror will successfully perform the required effort. |
| No Confidence | Based on the offeror's recent/relevant performance record, the Government has no expectation that the offeror will successfully perform the required effort. |
| Unknown Confidence (Neutral) | No recent/relevant performance record is available or the offeror's performance record is so sparse that no meaningful confidence assessment rating can be reasonably assigned. |

*Id.*

Under the technical section, the SSEB evaluated the offeror's management plan by identifying any strengths, weaknesses, or deficiencies. AR 152.  A strength is defined as an "aspect of an offeror's proposal that has merit or exceeds specified performance or capability requirements in a way that will be advantageous to the Government during contract performance." *Id.*  A weakness is defined as a "flaw in the proposal that increases the risk of

5

unsuccessful contract performance." *Id.* A deficiency is defined as a "material failure of a proposal to meet a Government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level." *Id.* Depending on the outcome of this evaluation, the SSEB would rate the management plan in accordance with this table:

| **Adjectival Rating** | **Definition** |
|---|---|
| Outstanding | Proposal meets requirements and indicates an exceptional approach and understanding of the requirements. Strengths far outweigh any weaknesses. Risk of unsuccessful performance is very low. |
| Good | Proposal meets requirements and indicates a thorough approach and understanding of the requirements. Proposal contains strengths which outweigh any weaknesses. Risk of unsuccessful performance is low. |
| Acceptable | Proposal meets requirements and indicates an adequate approach and understanding of the requirements. Strengths and weaknesses are offsetting or will have little or no impact on contract performance. Risk of unsuccessful performance is no worse than moderate. |
| Marginal | Proposal does not clearly meet requirements and has not demonstrated an adequate approach and understanding of the requirements. The proposal has one or more weaknesses which are not offset by strengths. Risk of unsuccessful contract performance is high. |
| Unacceptable | Proposal does not meet requirements and contains one or more deficiencies and is unawardable. |

*Id.* The five offerors who received the best past performance and technical ratings would advance to Phase II of the procurement process. AR 148.

In Phase II, the five offerors were to submit a proposal comprised of technical information, schedule, small business participation, and price and pro forma sections. The SSEB then will review the proposals under another set of criteria before the contract is awarded by the Source Selection Authority.

One of the key issues raised in this protest is what the solicitation says with respect to the use of pre-engineered buildings. Plaintiff points out that section 00116, which controls the preparation of the Phase I submissions, makes no specific reference to the use of pre-engineered buildings. The Statement of Work section ("SOW"), however, which controls the ultimate work which the agency wishes to have performed, does mention pre-engineered metal buildings. The general construction requirements subsection of the SOW states: "A pre-engineered building is not allowed for the Training Building or OMS. Pre-engineered buildings are typically used only for UHS buildings." AR 451. The structural design subsection also provides the following: "Unless otherwise accepted by the Government, the following systems shall NOT be permitted for the Training Center and Vehicle Maintenance Shops structures: Pre-engineered metal buildings." AR 465.

A limited allowance for pre-engineered buildings is made by reference to the Design Guide for United States Army Reserve Facilities, UFC 4-171-05 ("Design Guide"), where bidders could read that "[t]he unheated storage building serves only one function: the storage of operational equipment that requires no temperature or humidity control. A pre-engineered metal building system is frequently used to house this function." AR 1431. It also notes that UHS buildings "are typically simple pre-engineered metal buildings." AR 1432.

The material describing the agency's requirements for the Aberdeen Complex, therefore, made it clear that pre-engineered buildings were not acceptable for the principal buildings, unless a specific exception was made.

While Section 00116, which lays out the requirements for Phase I submissions and evaluation criteria, does not specifically direct the reader to other portions of the solicitation, such as the SOW or the Design Guide, it does indicate that "Phase I proposals will be evaluated in accordance with the factors and subfactors below . . . ." AR 150. One of the requirements, as mentioned above, was the submission of three projects similar in size and scope to the project at issue. Although the limitation in the SOW regarding pre-engineered buildings is not specifically mentioned at that point, the

evaluation criteria for past performance projects repeated the following explanation: "Present/past performance effort involved . . . the same scope and magnitude of effort and complexities *this solicitation requires*," with the wording varying for each rating, depending on how close the project was to the solicitation. *See* AR 151 (emphasis supplied). The evaluation of past projects is thus directly connected to the solicitation as a whole.

Plaintiff submitted its offer to the agency in response to the solicitation on March 17, 2015. Plaintiff listed three projects it had managed as the prime contractor that were completed within the previous five years and which exceeded the 45,000 square feet minimum size requirement of the Aberdeen Complex. The first two were [

]. A majority of the buildings for these two projects were constructed as pre-engineered metal buildings. [

]. There is no mention of pre-engineered metal buildings in the description of this project. All three projects involved construction of a training complex, office complex, educational facilities, and a multi-purpose complex. Plaintiff received favorable reviews following the completion of each of these projects. Plaintiff also submitted a management plan, as required by the solicitation. The management plan details plaintiff's approach to selecting subcontractors, coordinating the various subcontractors during the project, supervising the work of the subcontractors, and interacting with plaintiff's partner company, Gensler. Finally, plaintiff submitted the required documents in the pro forma section.

On March 23, 2015, the SSEB convened to review the 20 proposals that the agency received. After reviewing plaintiff's proposal, the SSEB deemed plaintiff's first two past performance submissions not relevant. Although they met the solicitation's size specifications, the SSEB noted as to each that the project was "NOT considered similar in scope because it was a pre-engineered metal building; which doesn't meet the complexity of the solicited project. . . . This project included little or none of the scope and magnitude of effort of the proposed project and is therefore considered Not Relevant." AR 1255. The third project was deemed very relevant. Based on all three assessments, the SSEB assigned plaintiff a confidence rating of satisfactory confidence. AR 1254-55. As for plaintiff's management plan, the SSEB did not identify any strengths or deficiencies. AR 1258. However, it did note one weakness: "The

[
                    ]." *Id.* Accordingly, the SSEB rated plaintiff's management plan as acceptable. *Id.*

Ultimately, plaintiff was not selected to advance to Phase II of the procurement process. The five offerors chosen to advance were [                    ]; [                    ]; [            ]; [              ]; and [                    ]. AR 1347. The following is a brief summary of the ratings these five companies earned on their proposals.

[                              ]

Two of [      ] comparable past performance projects were deemed relevant, and the other was very relevant. The SSEB gave [         ] a substantial confidence rating for past performance. The SSEB also identified six strengths, no weaknesses, and no deficiencies in [         ] management plan, earning [        ] a rating of outstanding.

[                          ]

Two of [        ] listed projects were deemed very relevant, while the other was listed as relevant. This earned [       ] a substantial confidence rating for its past performance. As for [       ] management plan, the SSEB identified two strengths, no weaknesses, and no deficiencies, resulting in a technical rating of good.

[                              ]

All three of [     ] past projects were rated as very relevant, leading to a past performance rating of substantial confidence. The SSEB listed four strengths, no weaknesses, and no deficiencies in [        ] management plan. This earned [     ] a technical rating of outstanding.

[              ]

Two of [    ] projects were deemed very relevant, and one was deemed somewhat relevant. The SSEB rated [    ] past performance with substantial confidence. [    ] management plan contained three identified strengths, one weakness, and no deficiencies, leading to a technical rating of good.

9

[                    ]

[            ] comparable projects received ratings, respectively, of somewhat relevant, relevant, and very relevant. The SSEB assigned an overall substantial confidence rating to [        ] past performance. The SSEB identified four strengths, no weaknesses, and no deficiencies in [      ] management plan, earning it a technical rating of good.

Of the fifteen projects listed in the five offerors's past performance sections, only three mention use of pre-engineered metal buildings. Two of [      ] projects contained several pre-engineered metal structures, but they were not the primary buildings constructed during the project. Similarly, one of [    ] projects mentions pre-engineered metal structures, but notes that these were only storage facilities that were ancillary to the primary building constructed. Unlike plaintiff's projects, therefore, [    ] and [    ] past performance did not primarily consist of pre-engineered metal buildings.

Plaintiff was one of fifteen offerors not invited to participate in Phase II by the agency's contracting officer, [            ]. [    ] of these unsuccessful offerors had the same past performance rating as plaintiff, satisfactory confidence, but received a higher rating of either good or outstanding for their management plans.

Plaintiff requested a debriefing by the agency. In response to plaintiff's question regarding why pre-engineered metal buildings do not meet the solicitation's requirements, the agency responded: "Pre-engineered buildings do not meet the proposed complexity of the project. The project description is listed within the Solicitation, specifically the Section 00116 and the Specifications provided with the Solicitation documents." AR 1351.

On May 1, 2015, plaintiff filed a protest with the Government Accountability Office ("GAO"). Plaintiff then informed the GAO that it intended to file a complaint with this court concerning the same protest. Pursuant to 4 C.F.R. § 21.11 (2015), the GAO dismissed the protest after plaintiff filed its complaint here on May 14, 2015.

DISCUSSION

The Tucker Act gives this court jurisdiction to "render judgment on an action by an interested party objecting to a solicitation by a Federal agency for

bids or proposals for a proposed contract or to a proposed award . . . or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (2012). Plaintiff is an "interested party" because it is a prospective bidder "whose direct economic interest would be affected by the award of the contract." *Am. Fed'n of Gov't Emps., ALF-CIO v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (quoting 31 U.S.C. § 3551(2)(a) (2012)). The agency's decision to exclude plaintiff from Phase II was made "in connection with" a proposed procurement, and plaintiff alleges that the decision was made in violation of applicable statutes and regulations. We therefore have jurisdiction.

I. Supplementation of the Administrative Record

On June 12, 2015, plaintiff filed a motion to supplement the administrative record with several documents: two affidavits by ACC employees; the pre-solicitation notice and the solicitation that the agency issued as part of its efforts to pursue the Aberdeen Complex as a small business set-aside; and an excerpt of the project's specifications that is referenced in the solicitation but not included in the administrative record. During oral argument, plaintiff dropped its request to add the two affidavits, and we agree, in any event, that they are not appropriately included. *See Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379-81 (Fed. Cir. 2009). Defendant agrees with plaintiff that the design specifications sheet referenced in the solicitation should be included and accordingly moved independently to have this document added to the administrative record and assigned it a record reference. *See* AR 1431-32. During oral argument, the government also conceded that the solicitation documents from the previous small business set-aside should have been properly included in the administrative record.

We agree with the parties that the design guidelines, which are referenced in the current solicitation, along with the previous Aberdeen Complex solicitation and pre-solicitation notice for the failed small business set-aside are appropriately included in the administrative record. They were before the agency at the time of its decision and they explain the terminology and specifications used by the agency.

II.     The Cross-Motions for Judgment on the Administrative Record

Plaintiff alleges that the agency violated the Competition in Contracting Act ("CICA"), Pub. L. No. 98-369, 98 Stat. 494 (1984) (codified in part as amended at 10 U.S.C. § 2305 (2012)), and provisions of the Federal Acquisition Regulation ("FAR").  The relevant portions of CICA state:

> (c) Procedures described. Two-phase selection procedures consist of the following:
>
>> (1) The agency develops . . . *a scope of work statement for inclusion in the solicitation* that defines the project and provides prospective offerors with sufficient information regarding the Government's requirements (which may include criteria and preliminary design, budget parameters, and schedule or delivery requirements) to enable the offerors to submit proposals which meet the Government's needs. . . . .
>>
>> (2) The contracting officer solicits phase-one proposals that
>>
>>> (A) include information on the offeror's
>>>
>>>> (i) technical approach; and
>>>>
>>>> (ii) technical qualifications; and
>>>
>>> (B) do not include
>>>
>>>> (i) detailed design information; or
>>>>
>>>> (ii) cost or price information.
>>
>> (3) The evaluation factors to be used in evaluating phase-one proposals are stated in the solicitation and include specialized experience and technical competence, capability to perform, past performance of the offeror's team (including the architect-engineer and construction members of the team) and other appropriate factors . . .

12

> . The agency evaluates phase-one proposals on the basis of the phase-one evaluation factors set forth in the solicitation.

10 U.S.C. § 2305a(c)(1)-(3) (emphasis supplied). CICA also mandates that "[t]he head of an agency shall evaluate sealed bids and competitive proposals and make an award based solely on the factors specified in the solicitation." § 2305(b)(1).

Furthermore, the applicable provisions of the FAR state: "An agency shall evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation." 48 C.F.R. § 15.305(a). Under the past performance evaluation section, the regulation notes that the "source selection authority shall determine the relevance of similar past performance information." *Id.* § 15.305(a)(2)(ii).

Both CICA and the FAR require that an agency's procurement decisions be based solely on the factors delineated in the solicitation. *Microdyne Outsourcing, Inc. v. United States*, 72 Fed. Cl. 694, 699 (2006). Nonetheless, the "solicitation need not identify each element to be considered by the agency during the course of the evaluation where such element is intrinsic to the stated factors." *NEQ, LLC v. United States*, 88 Fed. Cl. 38, 48 (2009) (internal quotation and citation omitted). Thus, "an agency still has 'great discretion in determining the scope of an evaluation factor.'" *Banknote Corp. of Am., Inc. v. United States*, 56 Fed. Cl. 377, 386 (2003) (quoting *Forestry Surveys & Data v. United States*, 44 Fed. Cl. 493, 499 (1999)). For a protestor to successfully claim that an agency relied on an unstated factor, it must show that the agency used a "significantly different basis" than the stated factors when evaluating the proposal, which resulted in prejudice to the protestor. *NEQ*, 88 Fed. Cl. at 48.

    A.    Evaluation Criteria, Complexity, and Pre-engineered Buildings

In its motion, plaintiff argues that the agency exceeded its authority under CICA and the FAR when the SSEB assigned no better than a satisfactory confidence rating, in part because it concluded that two of plaintiff's past history submissions did not demonstrate sufficient complexity due to their reliance on construction of pre-engineered buildings. The agency characterized these two projects as not relevant experience. While plaintiff acknowledges the discouragement of pre-engineered metal buildings in the

13

SOW, it argues that the SSEB could not measure relevance of past experience against the SOW, but should have limited its consideration to the literal application of the evaluation criteria for Phase I, listed in section 00116 of the solicitation, namely, size and scope. Plaintiff argues that what the agency did amounts to the application of an undisclosed evaluation term, namely "complexity," as measured by whether or not a building would be constructed using pre-engineering methods.

Plaintiff argues in the alternative that, even if the SSEB was entitled to look outside of section 00116 when evaluating the past performance projects, it should have recognized that the Design Guide's characterization of pre-engineered buildings as simple structures without climate control was incorrect. Plaintiff argues that this is readily apparent from the description of its prior pre-engineered metal building projects, which plaintiff contends were demonstrably as complex as what the agency wanted. Plaintiff asserts that the agency already utilized this approach when, under the first solicitation, it characterized [         ] past performance projects as acceptable even though they were primarily pre-engineered buildings. According to plaintiff, it would be inconsistent for the agency to categorically dismiss pre-engineered metal buildings as less complex when it considered them relevant in an earlier procurement for the same project.

In its cross-motion, defendant argues that the factor "similar in scope" would self-evidently include a comparison of plaintiff's past performance projects with the SOW, which presumptively prohibits pre-engineered metal structures for the two main buildings. We agree. Past performance as applied in Phase I cannot be read in isolation from the rest of the solicitation. The adjectival rating system for past performance obviously assumes relevance in connection with the work, as set out in the SOW, that the agency wants done. This is made explicit in the rating terms, which each include a reference to the solicitation generally. This is not superfluous. The Aberdeen Complex SOW explicitly prohibits pre-engineered metal structures for the OMS and Training buildings. AR 451.

Plaintiff points out that the prohibition of pre-engineered buildings was not absolute; the agency retained the discretion to permit pre-engineered metal structures, presumably if asked by a bidder. But there is nothing improper about the presumptive disallowance. Additionally, the agency's earlier acceptance of pre-engineered buildings to establish past performance was expressed during the market survey period conducted approximately two years

14

ago with the aim of awarding the work to a small business. The agency is entitled to refine its preferences as the procurement shifted from a small business set-aside to an unrestricted best value trade-off firm fixed price contract. *See SDS Int'l v. United States*, 48 Fed. Cl. 759, 772 (2001). We will not second-guess the agency's preferences regarding pre-engineered metal buildings, meaning that there was a disconnect between plaintiff's past performance and what the agency decided it wants.

      B.      The Management Plan and Lack of Prejudice

Plaintiff also takes issue with the agency's evaluation of its management plan. The agency concluded that ACC's management plan was not specifically tailored to the Aberdeen Complex and therefore assigned it a weakness. Plaintiff, however, asserts that the agency applied an unstated evaluation criteria because nothing in the solicitation required the management plan to be specifically tailored to the Aberdeen Complex. Additionally, plaintiff avers that [     ] management plan was not specifically tailored to the Aberdeen project either, but it was not assigned a weakness for the lack of specificity. Instead, that offeror ultimately received the rating of outstanding for its technical approach. Plaintiff argues that, if the agency had been consistent in docking offerors for failure to tailor the management plan, then ACC should not have received a weakness, which would have resulted, according to plaintiff, in an overall rating of good or outstanding for its technical approach.

As defendant points out, however, if plaintiff's past performance evaluation does not change, it has a serious problem in obtaining relief based solely on critiquing the SSEB's evaluation of other bidder's management plans.

The SSEB did not identify a deficiency in plaintiff's management plan; it only identified a weakness based on the lack of specificity.[2] In other words,

---

[2] The definitions of weakness and deficiency appear in the FAR, 48 C.F.R. § 15.001, which is incorporated into the solicitation by section 00116. Weakness is defined as a "flaw in the proposal that increases the risk of unsuccessful contract performance." AR 152. On the other hand, deficiency is defined as a "material failure of a proposal to meet a Government
(continued...)

15

the SSEB did not fault plaintiff's plan for failing to comply with the solicitation's requirements; rather, the SSEB concluded that the plan met the minimum requirements but contained this single weakness. This is why plaintiff ultimately received an acceptable rating. As defendant notes, even though [      ] management plan was not specifically tailored to the Aberdeen Complex, it merited six strengths, which set it apart from ACC's technical plan. The SSEB assigned plaintiff's management plan no strengths and one weakness for failing to tailor the plan to the Aberdeen Complex project. Because there were no identified deficiencies, the SSEB concluded that plaintiff's plan met the minimum requirements. We have no basis for overturning the agency's considered judgment in that respect.

More importantly, plaintiff cannot establish prejudice. As noted above, a protestor cannot be successful by merely showing a violation of the applicable statutes and regulations; it must also demonstrate that the violation resulted in prejudice, that there was a "substantial chance" the protestor would have received the award but for the violation. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1353 (Fed. Cir. 2005). Even if plaintiff's management plan was not deemed to have a weakness, it still would have merited no higher than an acceptable rating because the SSEB did not rate any offeror's management plan as good unless it identified at least two strengths. To merit a rating of good, the plan must contain "strengths which outweigh any weaknesses." AR 152. The SSEB did not identify any strengths in plaintiff's plan, and plaintiff does not argue that the SSEB should have done so. Accordingly, it is reasonable to assume that the plan would have been rated acceptable, which is defined as a plan where "[s]trengths and weaknesses are offsetting." *Id.* Furthermore, all of the offerors who received a technical rating of good had at least two identified strengths.

Without a technical rating of good and a past performance rating of substantial confidence, it is extremely unlikely that plaintiff would have been invited to advance to Phase II. The solicitation indicates that the agency will select five offerors to advance to Phase II. Plaintiff received a rating of satisfactory confidence for its past performance and an acceptable technical

---

²(...continued)
requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level." *Id.*

rating. All five of the offerors who advanced received a technical rating of good or higher. The agency also expressed substantial confidence in the past performance of the five offerors who were chosen to compete in Phase II. Furthermore, there were [ ] offerors who did not advance to Phase II who received better ratings than plaintiff. *See* AR 1348. Plaintiff has supplied us with no reason to think that it would have fared any better than these [ ] unsuccessful offerors had it received a higher past performance rating. Without prevailing on both issues, the relevancy of pre-engineered buildings in the evaluation of past performance and the application of an unstated evaluation criteria to plaintiff's management plan, ACC is unable to show that it could have scored high enough to be included in the final five.

    C.    Injunctive Relief

Plaintiff has failed to establish that the agency violated the law or was otherwise arbitrary or capricious in its decision-making to plaintiff's prejudice, and we, therefore, find it unnecessary to reach the issue of injunctive relief.

CONCLUSION

For the reasons stated above, we grant in part and deny in part plaintiff's motion to supplement the administrative record, and we grant defendant's motion to correct the administrative record. Furthermore, we conclude that the agency exercised reasonable judgment and complied with applicable statutes and regulations when it excluded plaintiff from Phase II of the procurement process. We therefore deny plaintiff's motion for judgment on the administrative record and grant defendant's cross-motion. The Clerk is directed to enter judgment accordingly. No costs.

                                            s/ Eric G. Bruggink
                                            ERIC G. BRUGGINK
                                            Judge